Before we begin the hearings, we have a motion for admission. I have an admission this morning. It's always both happy and sad because I'm happy to do the admission for one of my wall carts, but it also means traditionally that it's because they're leaving me and moving on. And that's the case today. Alan has been with me for just about a year now, and he's been a fantastic clerk, and I know he's going to have a great career. I'm particularly pleased that he's moving on to be a public defender in Miami, which is not a typical path for our courts clerks, but I think is very admirable to do that kind of public service. So, with that, I move the admission of Alan Cathier, who is a member of the Bar and is in good standing with the highest court of New York. I have knowledge of his credentials and I'm satisfied that he possesses the necessary qualifications. I wholeheartedly agree. And so do I. The motion is granted. Please raise your right hand. Go ahead. Good morning. May it please the Court. Ken Gallo of Paul Weiss for the appellant, Nietzsche. We respectfully submit that the judgment of invalidity on the 925 patent and the 960 patent is not supported by substantial evidence. It is based on expert testimony that is unsupported by and contradicted by the prior art in the record. For example, with respect to the 925 patent, the testimony was that the prior art barrettes disclosed using a single yellow phosphor to make white light. The testimony was that the red brief that you never raised the argument that the three color approach was conventional wisdom at the time of the invention below. That's not true, Your Honor. We raised it. Where is that in the record? It's at appendix 16414, for example, in the JMLL briefing. And it's in other places throughout the record in opening statement and other direct. But it is definitely in the JMLL appendix 16414. I'm sorry. Could you 16414 is what my notes say. I believe that's correct. I'll look in another location to be absolutely sure. And it was raised in various locations, which we cited in our brief throughout the course of the of the of the of the testimony. It was that we have citations that, for example, appendix one nine seven six five. And we have different citations in our brief where it was raised in the record below your honor. But it was actually in the record at JMLL for starters. Here's the issue, though, Your Honor. The testimony the testimony on the Barrett's patent was what color is the phosphor? The answer yellow. What kind of phosphor? Answer yellow. That's at one seven five eight three one seven five nine seven. That testimony is objectively wrong. Barrett's says repeatedly. It's making white light with the use of green, blue and red phosphors. That's a one nine seven six seven. For example, one nine seven six eight. In the context of a of an IPR, the PTAB just concluded that Barrett's does not disclose a yellow phosphor. But the district court in denying our JMLL. What did it mean in Barrett's when it said phosphor parentheses as close parentheses? I think that's where I think some of the decision making was zoning in on. Right. That Barrett's therefore obviously must have been contemplating either multiple phosphors or perhaps a single phosphor that would be combined with an LED. Right. So two answers to that, Your Honor. Answer number one is when you read that passage in context, it's discussing the different either a phosphor or it sometimes refers to it as a luminous or fluorescent. And then it says phosphor or luminescent is my recollection in params, meaning you could use two different luminescent materials. It's still not suggesting only one. And secondly, it doesn't disclose a yellow phosphor alone. It discusses red, blue and green phosphors repeatedly throughout the specification. But what if we were to conclude that at least for Barrett's, you know, under this very highly deferential substantial evidence standard, we're left to conclude that Barrett's did suggest something about using a single phosphor and not multiple phosphors. Well, Your Honor. I'm not saying that gets, you know, the jury all the way home to finding the claims invalid. But nevertheless, at least there's a conceptual teaching of using a single phosphor, not multiple phosphors, along with an LED. Well, Your Honor, first you use the word suggest, and I think it's important that it doesn't actually say that anywhere. And the expert testimony was that it said a yellow phosphor. And I think that's an important thing because it's a misstatement of the prior art, a clear misstatement of the prior art. I don't think even if it suggested a yellow phosphor. All right. Let's assume for the moment it didn't say yellow phosphor. And perhaps that's a misstatement. Well, then, isn't that something for you to deal with on cross-examination or closing or something else? There was cross-examination on that question. There was direct testimony that it didn't do it. Now, unfortunately, Nietzsche lost anyway. But my suggestion to you, Your Honor, is that the question here is substantial evidence. In the perfect world, cross-examination solves the problem, granted. But when an expert gets on the stand and says the prior art says X and the prior art does not say X, it says something different. It says three phosphors. Respectfully, this Court's jurisprudence is that that is not substantial evidence under Upjohn and the John Hopkins case. Upjohn is an invalidity case based on incorrect, objectively incorrect expert testimony. Johns Hopkins is an infringement case based on the same. And while we would all wish that cross-examination would solve the problem, sometimes it doesn't. And I don't think the fact that a cross- But I don't, I mean, I don't want to, you know, debate this, but that's not the only place that talks about a yellow phosphor. There's other references that talk about yellow phosphor. It was also, you know, known that blue plus yellow will get you white. So if we, you know, if we know that you can create light using an LED plus one phosphor, we know that blue plus yellow equals white. Why wouldn't you do it? Now, you know, thanks to Mr. Nakamura, he comes through with the big breakthrough of a blue LED, which everybody had been hunting for for decades. Now it's, the pieces start to, at least from that perspective, fall together. Well, this goes to the second point that I was going to address, Your Honor, is whether there's substantial evidence of motivation to combine. And I respectfully submit there's not, notwithstanding your point. And here's why. Number one, there's really three problems with the evidence on motivation to combine. Number one, it started from the false proposition that Barretts told a person of ordinary skill in the art, go find something yellow. Barretts didn't tell him that. It said three, it said blue, green, red. It starts from the second proposition that Tadatsu, the other primary reference, disclosed white light. That was also a false, an incorrect statement. Wrong. Wrong. Tadatsu does not. It discloses a blue light, improvement to blue light. And then it said, once you know you have a yellow phosphor, it's easy. You just go over to Hoffman, and you just go over to Phillips, and you find YAG. But if you don't, if it doesn't start from the false premise that Barretts discloses a yellow phosphor, you don't get there. Secondly, the undisputed position of both parties and all of the prior art that Everlight advocates, all through the prior art, is that color rendering is very important to have a successful product. That's what the market demands. That's what a person of ordinary skill in the art would understand who read Hoffman, who read Barretts, who read Phillips. All of them talk about the importance of color rendering. But then it doesn't lead you to just combine blue and yellow. Because Hoffman says, using… Is color rendering in the claims? It's not in the claims. I don't think it has to be in the claims, Your Honor, under KSR and under this court's opinion in In re Pasteur. I think KSR makes it absolutely clear that in considering a motivation to combine, it is proper to consider what a person of ordinary skill in the art would understand about market demands, what a person of ordinary skill would understand about what's important in order to have a successful product in terms of what the prior art teaches. And in re Pasteur, it was the question of whether the cell… It was a case where we were putting a foreign DNA into a cell. It did not claim… The red brief was saying how this color rendering concept was something that wasn't really argued ever before. It maybe came up once in your JMO, but it wasn't something that you were really talking about in front of the jury. It was raised below repeatedly, Your Honor. It was raised below… I can give Your Honor citations where it was raised below repeatedly. It was in all of the… All of the prior art has it in. And throughout the record, there was discussion of color rendering. I'm sorry, Your Honor. I'm looking for the citation on that. It was raised in JMOL for sure. And color rendering was raised, and Schubert testified about color rendering. It was described in the specification as an advantage in the A91. Hoffman discusses color rendering, and it was raised at JMOL. I guess I'm curious, where did the experts say you would never use the YAG in addition to a blue light in order to make white light? Because color rendering is absolutely critical for a white light. Well, Phillips itself, the actual prior art reference itself says YAG is detrimental to color rendering at A19786. Go ahead. Is that responsive to the… How do you respond to the Redbrief argument that says that that's not true? Redbrief at 61 says… 60 and 61. Right. I think, Your Honor, it's a misreading of the prior art. I think the prior art very clearly says Hoffman at 20410 says YAG would definitely result in lower color rendering index. Phillips, A19786, YAG is detrimental to color rendering. It is only when YAG is used after the blue phosphor is used, where you already have white light. Hoffman and Phillips already had created white light and used multiple colors. They then added YAG in that context, and they surprisingly found that in that context the color rendering was better. But it says YAG alone. They were surprised because YAG alone definitely would result in worse color rendering. And so where did you actually present it to the jury, I guess, is what I'm curious. Okay, Your Honor. I know it's written down perhaps. I mean, at least here's the way you're characterizing it in the reference itself. I don't know if the jury is reading every single prior art reference. So there's, Your Honor, one of our witnesses, Doxe, D-O-X-S-E-E at 17945, talked about the importance of good color rendering and that Nietzsche's LED had good color rendering. Everlight represented in opening that color rendering was a feature of Hoffman. Okay, I guess maybe I want something a little more specific. Where did one of your witnesses tell the jury you would not combine these references together with the primary references because color rendering is absolutely critical? And look at these passages in these secondary references which talk about using this YAG is not good for color rendering. I have a, Your Honor, I can give you a citation that's unfortunately not in the appendix. On April 16, at pages 81 to 83, our expert said, color rendering must be considered by a person of ordinary skill in the art when selecting a phosphor. So I can give you that reference. You're into your rebuttal time, so you know. Thank you, Your Honor. I think I ought to stop then because I would like to reserve some time for rebuttal. Thank you. May it please the Court. Ray Nimrod on behalf of Everlight, Your Honors. I'd like to address the sufficiency of the evidence before getting into the evidence that we had cited in our brief on each of the points. I would like to just briefly address the conventional wisdom and color rendering questions that Your Honors had been asking. On conventional wisdom, counsel has cited page A16414, and that states simply that it's a Jamal brief, and it states that the state-of-the-art prior to his invention was RGB LEDs or a phosphor-based solution with an essentially infinite number of choices. It does not say that the conventional wisdom is RGB, and that was not presented to the jury, as we have stated in the red brief. Your expert, Dr. Brett Schneider, discussing Barrett's patent, told the jury that it discloses blue LED mixed with yellow to get white. But Barrett seems to combine blue or UV with a generic phosphor. Where does it say yellow? Your Honor, the references are read from the viewpoint of somebody skilled in the art, and our expert relied on column 9, lines 38 to 45, where the specification states that you can get white light by taking the blue LED and using either singular or plural phosphors. Their expert heard our expert say, by the way, Your Honor, and did not disagree with that. Our expert said that tells somebody skilled in the art that if you want to get the white light, you can use a single phosphor, and there is no dispute, Your Honor, that as a matter of science, the only way to get a white light from a single phosphor is with yellow. And everybody agreed with that. That's a fair answer. And the other side's expert did not agree, and they didn't even cross our expert and say, no, that's not the case. So Barrett absolutely teaches white light obtained by blue plus yellow. And, Your Honor, it's also in their specification, the Tadasu reference, in column 1 and column 2, they say there are four prior art references, Japanese publications, that all disclose the use of blue plus yellow to get the white light. So it's admitted in their specification, and their expert said that once the blue light came out, everybody had a motivation to do a simple blue plus yellow solution. Just to say that the conventional wisdom was to do a three-color solution, which was more complicated, is contrary to the references, their specification, and their expert's admission that there is a very high level of motivation to make a blue LED combine it with yellow to make white light. We also were talking about sufficiency of the evidence. We have the OSRAM simultaneous invention. Six weeks after the Nishiya's earliest possible filing date, OSRAM files an independent patent application in Germany on the exact same solution. Six weeks later, and it is taking the blue LED, adding YAG to it to get white light. Now, once again, this is sufficiency of the evidence. And this court's precedent states that the jury could take that as persuasive evidence as to the fact that that was something of ordinary skill. What's the reason, do you think, why it took three years after Nakamura's blue LED to produce, to practice this combination? Well, Your Honor, that was an issue that came out actually in the trial. It wasn't really three years to begin with. What happened is the blue LED came out, and then there's a 1994 Nakamura reference that states that now we're starting to get commercial manufacture of the blue LEDs. They came up with the idea, and then they had to go and refine it and make something that was viable. So that was an issue of fact for the jury. So the blue LED comes out in 1994. There's references saying combine it with yellow in 1995, and then in 1996, while they're still making improvements to the blue LED, which are in limited supply at that point, both the CHIA and OSRAM both come up with what is the most obvious solution in the world, which is to use blue plus yellow to make white. And, Your Honor, there's a high degree of evidence that says that there's a limited number of phosphors that you can use in order to survive the severe operating conditions of things like lasers, mercury vapor lamps, et cetera. So someone would be motivated to go to YAG because their experts said there's a limited number. The Hoffman reference states that YAG is a welcome addition for a very limited number of phosphors that can withstand the conditions of the mercury vapor lamps. There were no white LEDs in 1996. So when somebody's looking for the appropriate phosphor, they have to look to some other lighting technologies. And the one that was being used for lasers, mercury vapor lamps, et cetera, with any harsh conditions was YAG. The CHIA went to it, so did OSRAM. The jury had plenty of evidence to decide that, in fact, this was an obvious thing to do. And I would also point out this color rendering, Your Honor, they did not bring that up with the jury at all. It came up twice in the transcript on color rendering. One time it had to do with an enablement issue. Another time it had to do with just some background issues. But nobody said that color rendering would dissuade somebody from using YAG. And, in fact, the references that they're citing, both Hoffman and Phillips, they're relying on paragraphs in both of those references that were never even testified to by either expert or brought to the attention of the jury. It simply counsels interpretation on appeal as to what that, in fact, would teach somebody. And are you aware of that expert statement that the other side raised in the opening argument that doesn't happen to be in the joint appendix but is in the record somewhere? I am not aware of that, Your Honor. We did a search of the appendix and we found color rendering had to do with testimony at A17944. It had to do with an award. Are those awards in the record anymore? There are awards in the record, Your Honor. And that one actually is interesting because that's an award that was issued seven years after their alleged invention date. And it had to do with coming up with a red phosphor that was invented at that point years later that made the color rendering better. In other words, they made a blue plus yellow, and the color rendering wasn't as great as they wanted it to be. And they came up with a red phosphor to add to it, and they got an award for that. Nothing to do with this invention at all, Your Honor. Where were those? I mean, they're evidence. But where were those in the appendix? All I found was a press release. Oh, Your Honor, I'm not sure if the – I'm sorry. I apologize. I'm not sure if the awards themselves are in the appendix. There are references to them, yes. Yeah, that's right. That's right, Your Honor. Can we talk about the 960 patent? Yes, I was just going to turn that. Specifically the JP959? Yes, Your Honor. Is it a misreading of the reference to rely on figure 1C as an embodiment disclosed in JP959 when the better reading is that it's just an intermediate step to arrive at the final product, which is figure 1E, where the device is turned upside down in order to get a concentration of phosphor down towards the LED component? Your Honor, for the 960, the evidence the jury had was actually twofold. They had evidence as to why someone would want the phosphor to be placed closer to the chip in some circumstances, and we relied on the Barrett's reference for that. And the JP959 was teaching you the how, how to accomplish it. In other words, that figure 1C shows you the gravity. If you take the chip and you put the resin on top of it as the phosphor interspersed throughout it, because it's liquid, molten, and you have phosphor particles in there, and you let it sit, then it will settle down. And if you flip it over, it will go towards the surface away from the chip. So our expert relied on the JP959 to show that people would know that you can accomplish either one of those two. Whether or not that's the final step doesn't really matter. That has to do with how you accomplish it. In other words, if you let it sit there and let it settle to the chip and you don't flip it over, you can concentrate it towards the chip. So it's simply there, Your Honor, to show that someone would know how to achieve the concentration near the chip versus the surface. But Barrett's is the one that provides the motivation and reason to do it, like why you would do it. Barrett's teaches that certain phosphors are, in fact, subject to degradation. And because they're subject to degradation based on the, sorry, the phosphors are subject to degradation based on the environment. And Barrett's says for phosphors that are subject to degradation based on the environment, you need to put them in the resin. And our expert explained that. Their expert did not disagree. And our expert said as a result of the fact that it's subject to degradation from the environment, you want to place it as far as you could away from the surface, because these are permeable, these resins, to get away from the environment. And that's why there would be a reason to bring it down. Did the Supreme Court judge rely on that in the Jamal decision? I believe that he, let me check that, Your Honor. I think he did. But I believe he relied on the, another, if I can just address one other point and then I'll get right back to that. The judge also relied on KSR, which states when there's limited options, then it is obvious to, though, do the routine predictable things. And our evidence showed there were only three options with respect to concentration. One is you concentrate it away from the chip towards the surface. The other is that you concentrate it towards the chip away from the surface. And the third option is simply have an even concentration. So if there's only three options under KSR, Your Honor, that would suggest that, in fact, it's obvious because a person skilled in the art would be able to routinely look at the different phosphor he has and decides, he or she decides, is that something I want to place near the surface, near the chip, or it doesn't matter? And I would like to point one other thing out before I get to the Jamal we're looking at right now, Your Honor. And that is the 960 patent is not teaching that it's against the conventional wisdom or there's something special about concentrating the phosphor near the chip. It actually discloses that you can concentrate it towards the surface away from the chip or you can concentrate it towards the chip just depending on the particular phosphor that you are looking at. So it's saying either one. Claim one says blue LED plus yellow and you concentrate it either near the chip or away from the chip. Claim two claims the embodiment where it's towards the chip and claim three where it's away from the chip. So there's nothing special here other than the obvious idea that there are some phosphors that are subject to degradation, as our experts testify, due to intense heat from the chip, whereas other phosphors are subject to degradation from the environment and to be placed towards the chip. So I think under KSR, and I believe that's what the district court relied on, is that he relied on the fact that there were limited options and therefore under KSR, since there's only three options, that would be within routine, ordinary skill to get to that. Our expert testified that barrettes would motivate you to take the phosphor and place it near the chip for those resins that are subject to degradation from the environment, which is clearly taught by barrettes. So whether or not the district court mentioned that point, Your Honor, it is in the record and it's evidence that the jury could have relied on, and I believe did rely on, to say that a person would have a reason to concentrate the phosphor near the chip for the type of phosphors that barrettes was talking about that are subject to degradation due to the environment. And once again, their expert did not disagree with that. The barrettes had that teaching when he testified. Hypothetically, if we were to affirm the jury's verdict of invalidity in the 925 and the 960, does that make your cross-appeal moot? Your Honor, as a practical matter, I would say, you know, that would be, obviously the inequitable conduct's a bit different and there's some claims there, but the patents are expiring. So if it was affirmed on, in other words, there's a possibility I suppose they could assert some other claims against us that were not subject to this appeal. But I think as a practical matter, if you found that these claims were invalid, whatever additional relief might come from inequitable conduct is probably, in a practical sense, moot. Really, the same question about functional mootness or legal mootness? No, as a practical matter, because if it's inequitable conduct for Claim 14, then the whole patent would be unenforceable and not all the claims are at Issue No. 1, and we would probably ask for attorney's fees on that basis as well. So this is not a contingent cross-appeal? No, no. As a legal matter, it is something, it's a separate issue, and there is additional relief-slash-benefits, you might say, that would be obtained by that if we were in fact right about it. So if we, essentially the same question, that is, if we agree with you on obviousness, do we have any reason to reach indefiniteness? No, you don't, Your Honor. That's completely alternative. Yes. And, Your Honor, I believe I only have two minutes left. Just very quickly on inequitable conduct. Our belief is that the judge's findings on materiality were inconsistent with the enablement finding because we only had one enablement theory, excuse me, enablement theory, and that was that you can't get to 600 nanometers in the wavelength, which is a claim range, unless, excuse me, you can't get to 600 using the one method disclosed in the patent, and that was increased scalability. You've got to win both on materiality and intent, right? That's right, Your Honor. And the district court judge concluded that it's not the single most reasonable inference that they were deceptive in whatever allegedly false statement was made in the patent. Okay. Yes, Your Honor. So what's the standard of review on that finding? On that point, Your Honor, if you find that materiality was, in fact, wrong, then I think you'd have to remand it because he— No, but what's the standard of review on a district court's determination on intent and inequitable conduct determination? I believe that would be clearly erroneous, Your Honor. Okay. But, Your Honor, in that case, he didn't address— one of the things he said was inconsistent with the jury verdict. He said that the actual test the jury was presented that said you couldn't get to 600, in the inequitable conduct trial, he said, well, maybe they did get to 600 with those identical tests. Their expert came in in the inequitable conduct trial and said, I've relooked at these tests, and, in fact, they get you to 592. But those are the identical tests the jury said do not get you near 600. So, for intent, we would say his intent analysis was flawed because even for intent, he was relying on evidence that was inconsistent with the jury's verdict necessarily. Thank you, Your Honor. Thank you, counsel. If it may please the Court, I'd like to address the 960 patent, which I didn't do in the opening comments. As Judge Chen, you pointed out, the issue with the 960 patent, from our perspective, is that their expert testified about Step 1C as if it was a final step in a method patent. It is not a final step. It's an intermediate step. And he suggested that the intermediate step was a teaching of the patent, which it is not. The final step of the patent, the teaching of the patent, is to invert the LED device. And when the LED device is inverted, it does not teach phosphor settling down toward the LED chip. It teaches phosphor in a uniform dome below the LED chip. The district court judge accepted at JMOL the characterization of 1C as a teaching of the patent. And that is wrong. And when he cited 1C, the figure wasn't even in the evidence that he cited as support. What if there's a larger way of looking at understanding the reference in the sense that it talks about a desire, an interest in creating some concentration of a phosphor and creating some kind of phosphor concentration gradient. And then it does, in fact, disclose 1C. I mean, it's taught. I mean, it's there. It's illustrated in the patent. We can't walk away from that and turn a blind eye to it. I understand the argument that it's merely an intermediate step. But then if you go on and say, okay, so there's only a few ways to concentrate the phosphor. And one is near the top and the other is near the bottom. And then either one, one is, you know, perhaps the express intention of the 969. But nevertheless, the other one is a very obvious alternative to that. Well, Your Honor, it actually doesn't teach how to create a phosphor concentration near the LED chip in Step 1C. It's not a final step, so it doesn't teach about drying. It doesn't teach about when the solvent dissolves, what's going to happen. We don't know what happens if you stop at Figure 1C. The patent doesn't teach that. It only teaches it about 1E when it says now you do two more things or three more things and you end up with a uniform dome shape. So I don't think you have to read into the patent things that are not there and the teaching is not there, and it's only the final step that is taught. Importantly, though, Barretts also does not teach that you should have a gradient toward the LED chip. Barretts does not recognize the problem of moisture, and it has four locations, none of which are a gradient toward the LED chip. Thank you very much. Thank you, counsel. Your Honor, I don't have any other further comments unless you have questions for me. Thank you.